# Nathan C. Harris's Appeal.

The rule that the findings of a fact of a master in equity suits, concurred in by the court below, will not be reversed by the supreme court upon appeal unless clear error is pointed out, and that where that is not done, such findings have the same weight and conclusiveness as though found by a jury—reasserted.

NOTE.—A pledge of stock not yet issued will be enforced when it is issued (Hetzel v. Sawyer, 10 Pa. Dist. R. 29); so in the case of the pledge of an interest in a projected limited partnership (Collins's Appeal, 107 Pa. 590, 52 Am. Rep. 479); or of an undivided interest in a partnership (Wallace's Appeal, 104 Pa. 559); or of the future proceeds of a sale of specified property (East Lewisburg Lumber & Mfg. Co. v. Marsh, 91 Pa. 96); or of an interest in a decedent's estate prior to distribution (Handy's Estate, 167 Pa. 552, 31 Atl. 983, 986); or of an equity of redemption in bonds pledged (Cessna's Estate, 192 Pa. 14, 43 Atl. 376).

An act of assembly authorized a canal company to change itself into a railroad company and to construct a railroad "along and upon or near the towing path or berme bank" of its canal; thereafter W., the president of the canal company, entered into a written contract to sell to P., who represented the company which was to build the railroad, the charter, capital stock, and franchises of the canal company, and to pay all claims for right of way "that may arise and have to be paid hereafter by reason of the construction of a railroad along and upon the towing path or berme side of the said canal, as authorized by the act of assembly." *Held*, that the word "near" appearing in the act was intentionally omitted from the contract, and that therefore W. was not bound, under the contract, to pay for rights of way where the railroad diverged from the canal.

Part of the consideration mentioned in said contract, which P. agreed to pay to W., was a certain sum in the capital stock of the railroad company to be organized; before certificates for this stock were issued, W. authorized the L. V. Co., to whom P. had assigned the contract, to hold said stock as collateral security for the fulfilment of the contract on his part; thereafter W. died without having demanded from the L. V. Co. the sum represented by said stock. *Held*, that such corporate stock was a subject of pledge or collateral security, although the certificates therefor were not in existence at the time of making the contract of pledge, and that the lien so created attached to the stock as soon as the certificates issued; *held also*, that it appeared that the portion of the consideration agreed to be paid W. in such stock had been so paid, and that hence the present holders of W.'s claim and rights, by purchase thereof from his administrator, were not entitled to recover from the L. V. Co. the sum for which such stock was issued, but were only entitled to redeem such stock, on paying to the L. V. Co. the amount of advances made by it secured thereby.

(Argued March 18, 1886, Reargued March 14, 1887.   Decided Jan. 3, 1888.)

January Term, 1886, No. 218, E. D.   Appeal by Nathaniel C. Harris *et al.,* plaintiffs, from a decree of the Common Pleas of Bradford County in a suit in equity for an account, etc., in which the Lehigh Valley Railroad Company *et al.,* were defendants, September Term, 1880, No. 3.   Affirmed, with modification.

The facts connected with the questions passed upon this appeal sufficiently appear from the opinion of the court below, MOR- ROW, J., which was as follows:

A statement of some of the material and undisputed facts may aid in understanding the case.

On the 25th of October, 1865, and for several years prior, the North Branch Canal Company maintained and operated a

canal known as the North Branch Canal, extending from North-
ampton street in the city of Wilkesbarre, along the North branch
of the Susquehanna river, to the state line near Athens, in this
county.   It was constructed by the state, and sold under the act
of April 21, 1858, entitled "An Act for the Sale of State Ca-
nals," P. L. 414.   It provided for the assessment of damages
caused by the construction of the canal, and the payment of such
damages by the purchasers.   The North Branch Canal Com-
pany was organized April 15, 1858.   Its capital stock was fixed
at $1,750,000, and divided into 17,500 shares of $100   each.
There were 590 bonds of $1,000 each, secured by a mortgage
upon the company's property.   The stock was all subscribed for
May 24, 1858.   Some of the subscribers not having paid their
assessments, 6,878 shares were forfeited under a resolution of
the board of directors, of April 13, 1860, leaving unforfeited
October 25, 1865, 10,622 shares.   From the organization of the
company until the organization of the Pennsylvania & New
York Canal & Railroad Company, March 1, 1866, Col. Charles
F. Welles, Jr., was president.   He owned a large block of the
shares and bonds.

March 25, 1865, the following act was passed (Pa. Laws,
1865, p. 427):

"Sec. 1.   That the North Branch Canal Company be and are
hereby authorized to change their name, style, and title to the
Pennsylvania & New York Canal & Railroad Company:   Pro-
vided, That all rights of creditors and liens against the canal
company shall continue and remain unimpaired; and that all
the obligations and liabilities of the said North Branch Canal
Company, shall attach to the said canal and railroad company
and be enforced against it, as fully as they could have been
against the said North Branch Canal Company.

"Sec. 2.   That the said Pennsylvania & New York Canal &
Railroad Company be and are hereby authorized to construct a
single or double track railroad along and upon or near the towing
path or berme bank of their canal from any point in Luzerne
county to any points upon the New York state line in the county
of Bradford, with power to construct branches or lateral roads
to any points in the counties of Bradford, Wyoming, or Lu-
zerne; and in the location, construction, and management of said
railroad and branches, the said Pennsylvania & New York Canal
& Railroad Company shall have all the powers, and be subject to

all the restrictions, of an act entitled 'An Act Regulating Railroad Companies,' approved the 19th day of February, A. D., 1849, and the several supplements thereto.

"Sec. 3. That it shall be lawful for the president and directors of said Pennsylvania & New York Canal & Railroad Company, upon a vote of the stockholders, at a meeting called for that purpose, to increase the capital stock of their company to such sum as may be necessary to construct and equip said railroad or any portions thereof, or they may, when directed by the stockholders, as above, issue from time to time the bonds of said company payable at any period not exceeding twenty years after the date thereof, with interest not exceeding 7 per cent per annum, payable semi-annually; and for securing the payment of said bonds, with the interest, to execute a mortgage or mortgages of and upon said railroad and its branches and appurtenances, or upon any portion thereof."

On the 25th of October, 1865, the following contract was executed by Charles F. Welles, Jr., and Asa Packer:

Memorandum of agreement, made the 25th day of October, 1865, between Charles F. Welles, Jr., of Athens, Pennsylvania, of the first part, and Asa Packer, of Mauch Chunk, Pennsylvania, of the second part, Witnesseth,

That the said Charles F. Welles, Jr., for the consideration hereinafter mentioned, hereby agrees to sell and convey to the said party of the second part, his heirs or assigns, the charter, entire capital stock, and franchises of the North Branch Canal Company with all lock houses, improvements, tools, and appurtenances belonging to or connected with said canal. The said Charles F. Welles, Jr., also agrees to pay all bonds, debts, and obligations of the said North Branch Canal Company of every description, including all unsettled claims for right of way, and also all claims for right of way that may arise and have to be paid hereafter, by reason of the construction of a railroad along and upon the towing path or berme side of the said canal, as authorized by the act of assembly approved the 20th day of March, 1865, and the construction of a towing path upon the berme side of said canal.

The said Asa Packer, party of the second part, hereby agrees to purchase the said capital stock and franchises, canal and improvements, of the said party of the first part and to pay him in

full consideration therefor the sum of $1,050,000, as follows: $150,000 on or before the 15th day of December next; $150,000 on or before the 15th day of April, 1866; $150,000 on or before the 15th day of August, 1866; $150,000 on or before the 15th day of December, 1866; $200,000 in bonds of the Camden & Amboy Railroad Company, at par (the interest that may have accrued upon said bonds to be adjusted at the time of transfer), and $250,000 in the capital stock of the Pennsylvania & New York Canal & Railroad Company at par, upon the organization of the said company. The possession of the said capital stock, canal, and appurtenances is to be delivered to the said party of the second part on or before the 15th day of December, next, when the bonds of the Camden & Amboy Railroad Company are to be delivered, and the first payment of $150,000 made, and notes for the deferred payments given.

After a number of payments had been made to Welles, Packer, on the 13th day of February, 1866, assigned the contract to the Lehigh Valley Railroad Company. After this Welles and the company treated it as a contract between themselves,—the company repaid Packer all he had advanced to Welles, and made all the payments to Welles after the assignment. Indeed, from the pleadings and evidence, it may be inferred that the contract was originally intended for the benefit of the Lehigh Valley Railroad Company.

The Pennsylvania & New York Canal & Railroad Company was organized March 1, 1866. At that time Welles had received in cash $375,000, and nearly all of the Camden & Amboy bonds. By the 24th of October following, he had received altogether $682,641.81, including all of the Camden & Amboy bonds. This left $117,358.19 unpaid of the cash payments and due December 15, 1866. On March 1, 1866, Welles had taken up and delivered to the Lehigh Valley Railroad Company 9,920 shares of the North Branch Canal Stock, and during the next three or four years he took up and delivered all the other shares, excepting 215, which are still outstanding. So, on the first day of March, 1866, he had paid 504 bonds, leaving 86 unpaid. These he directed the Lehigh Valley Railroad to pay. They paid 84, and charged the amount to Welles. The two are unpaid and outstanding.

On the organization of the company, there was nothing said

or done towards the delivery to Welles of the $250,000 in its capital stock; by reason of which the plaintiffs claim the Lehigh valley company became liable to pay them $250,000 in money. But it appears that the parties regarded Welles as the owner of the stock, for, on the 12th of September, 1866, he agreed that the Lehigh. Valley Railroad Company should hold said stock as collateral security for the performance by him of his covenants with Packer. This is evidenced by the following agreement:

"I hereby authorize the Lehigh Valley Railroad Company to deposit to my credit in the Farmers' & Mechanics' National Bank of Philadelphia the sum of $25,000—which will be a payment on account of the contract between Asa Packer and myself dated October 25, 1865.

"It is also understood and agreed that the stock in the Pennsylvania & New York Canal & Railroad Company to my credit, amounting to $250,000—shall be held by the said Lehigh Valley Railroad Company, as collateral security for the fulfilment on my part of the several specifications in the contract aforesaid."

As further evidence that he treated it as stock, he gave the following order to V. E. and J. E. Piollet: "Athens, Bradford County, Pa., July 29, 1868, . . . the president and directors of the Lehigh Valley Railroad Company will please pay V. E. & J. E. Piollet $12,000 in the full paid shares of the Pennsylvania & New York Canal & Railroad Company's capital stock for value received, and charge the same to account of C. F. Welles."

In pursuance of this order 240 shares of stock of $50 each were issued to Messrs. Piollet. So again, on the 6th day of August, 1870, after the certificates of stock had been issued to the Lehigh Valley company, Welles, to secure a large debt due Ellen J. Welles, assigned to her "the full number of shares in the capital stock of the Pennsylvania & New York Canal & Railroad Company, which of right belong, or may belong, to me under my arrangement or contract with Asa Packer, dated October 25, 1865, now assigned and held by the Lehigh Valley Railroad Company, certificates for which have not yet been delivered, not including, however, in this transfer 125 shares assigned to V. E. Piollet, . . . with power to sell said stock and make transfers upon the books of the company." Mrs. Welles's in-

terest in this stock, under this assignment, was afterwards transferred to James H. Webb, who transferred it to N. C. Harris.

From these agreements and the conduct of Welles, the Lehigh company claims that both Welles and the company treated the agreement to pay $250,000 in stock as stock, the same as if the certificates had been issued; and the company claims that the agreement of September 12, 1866, was a pledge of the stock for overpayments already made, and in payment for certain obligations for right of way, etc., which Welles was to pay, but was unable to pay. The master, however, held that the company had the option to take the stock or pay in money,—elected to take the stock and pay the $250,000 (less $12,000 had by Messrs. Piollet), and he accordingly charged the Lehigh Valley railroad with interest from May 29, 1876, holding that Welles had then substantially performed his contract, and holding also that the agreement of September 12, 1866, was not a pledge, for the reason that Welles had in fact no stock to pledge (the certificates not having been issued), but "to mean no more than a stipulation by Welles, whereby he agreed to withhold the assertion of any claim to a performance of the covenants to pay this stock until his covenants should be performed."

Upon the organization of the Pennsylvania & New York Canal & Railroad Company, Welles was elected president and held that office until January 9, 1870. After that he was director until his death, which occurred October 9, 1872. His estate was insolvent. Asa Packer died May —, 1879. The company immediately upon its organization took possession of the canal, maintained and managed the same, collecting tolls, etc., until it was abandoned by authority of an act of assembly, approved April 2, 1872. Work was soon commenced to construct the railroad, and in the fall of 1869, trains were run its entire length.

The Lehigh Valley Railroad Company paid for bonds and coupons from January 27, 1868, to October 27, 1869, $97,152.-69. Also from December 16, 1869, to October 25, 1870, $51,-848.20. Also from January 12, 1870, to October 23, 1873, sundry claims amounting to $2,012. Schedule F contains a statement of claims for rights of way paid by the Lehigh Valley company, and allowed by the master, amounting to $82,314.41. These payments began in 1866, and ended during the year 1874. There are several large items in this schedule in dispute, because

the railroad was built in some places some distance from the canal. The plaintiffs contend that Welles was not to pay for rights of way, unless the railroad was constructed "along and upon the towing path or berme side of said canal;" that the word "near," mentioned in the act of March 25, 1865, was intentionally omitted from the contract of Welles and Packer. The defendant says the departures were with Welles's consent, and in fact to his advantage. The master charged the plaintiffs with the rights of way where Welles was present, advised, and approved the divergence from the canal. The principal departures were across the Wysox flat (where the line was shortened 2¼ miles), near Pittston (where the Pittston branch was purchased), and in Wilkesbarre.

The plaintiffs were charged for the purchase of the Pittston branch $34,300.73, and in going across the Wysox flat, damages as follows: V. E. Piollet, $5,000; E. B. Coolbaugh, $1,300; H. W. Nobles, $1,400; M. H. Laning, $3,000; H. J. Madill, $3,000; D. Williams, $450; L. R. Coolbaugh, $300; H. B. Morgan, $500. And in Wilkesbarre, the Wilkesbarre Coal & Iron Company, $500, and John Conner, $1,000.

It was thought by the Pennsylvania & New York company that by the act of March 26, 1865, they were bought under the general railroad law of 1849, and their shares of stock should be $50 each. The North branch shares were taken up, and double the number of Pennsylvania & New York shares were issued in their place. This was about the middle of March, 1869. At that time Welles had delivered 10,382 shares of North branch stock. In their place were issued by the Pennsylvania & New York company 20,764 shares. Four certificates of $5,000 shares each were issued to the Lehigh valley company March 20, 1869. These certificates were signed by Welles as president, and, it is claimed, included the 5,000 shares which the Lehigh valley company now holds under the agreement of September 12, 1866, as a pledge.

The Pennsylvania & New York company issued bonds to the amount of $3,000,000 and secured them by mortgage upon the company's property, and afterwards on April 8, 1869, an act was passed authorizing the company "to issue as many shares of preferred stock as may be necessary to finish the railroad."

Four millions of dollars was the amount fixed upon as the amount necessary for that purpose, and it was divided into

40,000 shares of $100 each. The holders of the common stock were entitled to their *pro rata* share. Colonel Welles assisted in procuring the passage of the act, and presided at the meeting of September 30, 1869, when it was accepted. He had full knowledge of his right to subscribe for his proportionate share of the preferred stock, but declined because of his inability to pay for it. The master did not find this fact, but it is in evidence and uncontradicted. After this the preferred stock was distributed between the subscribers in proportion to their common stock.

The certificates for the $250,000 capital stock mentioned in the contract of October 25, 1865, were issued to the Lehigh valley company March 20, 1869—that is to say, all the Pennsylvania & New York common stock was included in the 20,764 shares mentioned above, of which 20,000 shares were issued to the Lehigh valley company. The plaintiffs claim that the company held the 5,000 shares, less the 240 delivered to Messrs. Piollet, as the trustee of Welles,—that the preferred stock issued to them was also held in trust, and that the plaintiffs are entitled to recover its value and all dividends received upon it. This claim the master thought of recent origin and refused it. No evidence was given of the value of either the preferred or common stock.

James H. Webb, administrator of Welles, *c. t. a.,* in 1875, and again the next year, went to Mauch Chunk and undertook to get a settlement of the matters involved in the Welles-Packer contract, but was unsuccessful, for the reason, he was told, there could be no settlement until the question of the forfeited stock of the North Branch Canal Company was adjudicated. After this he obtained an order of the orphans' court and sold the interest of Welles in this contract to N. C. Harris for himself and others.

Under the pleadings the plaintiffs asked for an account and a decree for the balance in money that may be found due them. The defendants claim that the $238,000 in stock was a pledge under the agreement of September 12, 1866, and that the pleadings should be considered as a bill to redeem.

This is a sufficient statement of the facts, and they present the two leading questions,—first, the liability of Welles for the payment of damages for right of way, where the railroad diverged from the canal; and, second, whether the $250,000 of the capital

stock was pledged to the Lehigh Valley Railroad Company, under the agreement of September 12, 1866.

1. It is without doubt, that the divergence across the Wysox flats, near Pittston, and at Wilkesbarre, secured a shorter and better line of road, and a better roadbed and curves.   The company could locate the road, within the limits prescribed by the act of assembly, as they saw fit, with or without the consent of Welles.   The act authorized "the construction of the road along and upon, or near, the towing path or berme bank of their canal."   Welles by his contract agreed to pay for right of way "by reason of the construction of a railroad along and upon the towing path or berme bank of said canal as authorized by ac t of assembly."   The word "near" was left out of his contract, and we think, intentionally; for it is not reasonable to suppose that Welles, with his experience and knowledge as a railroad man, would undertake to pay for rights of way, without knowing where the road was to be located.   It was enough for him to say : "I will pay for the right of way, if the road is constructed in a certain place."   But it was no less his duty, as president of the company, to co-operate with the directors and engineers to secure the shortest line and best location practicable without regard to the fact whether it was to his advantage or not.   His presence on the ground, therefore, and insisting upon such location, would not change his liability under the contract.   For it is not a disputed fact, but that every divergence from the canal, secured a better roadbed, shorter line, and easier curves,—advantages greatly in excess of the cost to the company for the rights of way.   This construction of the contract relieves the plaintiffs from the sums mentioned above for the divergence at Wysox,— near Pittston and Wilkesbarre,—aggregating $50,750.73,—and to be deducted from the amount charged by the master against the plaintiffs in schedule "F."   The other items allowed in that schedule seem to be correct.

This disposes substantially of the exceptions relating to charges by the Lehigh valley company for moneys paid for rights of way.   I think a reasonable construction of the contract would warrant such charges, where the road was built "along and upon the towing path," etc., and it was necessary to take narrow strips of land more than the towing path or berme bank afforded.   Such damages were but incidental and unavoidable, and I think the

master's construction in that respect was correct. The plaintiffs' exceptions not sustained as above are dismissed.

2. I think the master was right in his construction of the contract of October 25, 1865, in this, that the covenants were mutual and dependent, and could not be enforced until they were performed, and therefore Welles not having performed his covenants March 1, 1866, when the Pennsylvania & New York Canal & Railroad Company was organized, was not entitled to the $250,000 in capital stock of that company, at par. There were 702 shares of the North Branch Canal Company outstanding, and 86 bonds. If this is a correct construction of the contract, then the Lehigh valley company did not become liable on that day to pay Welles $250,000, in money, nor did they become liable for several years thereafter, even if it be held that his contract was substantially performed with the 215 shares of stock, two bonds, and unsettled North Branch Canal claims still outstanding.

But, aside from this, while his covenants were unperformed, September 12, 1866, Welles agreed that the stock "standing to his credit" should be held by the Lehigh valley company as collateral security for the performance of his contract. Again he called it "full paid shares" when he gave the order to Piollet. So, too, August 6, 1870, he assigned it to Ellen J. Welles, as "shares of capital stock, now assigned and held by the Lehigh valley company." The contract was his substantial right to the stock; certificates are only evidences of it. But it is claimed, and was so held by the master, that because certificates had not been issued he had no stock to assign or pledge.

In Collins's Appeal, 15 W. N. C. 5, GREEN, J., said: "The existence of the subject of the pledge, at the time the contract of pledge is made, is not at all necessary. If it comes into existence afterward it is affected in equity at once by the lien stipulated for."

This is a stronger case, for not only the contract of September 12, 1866, was of force in equity, and when the certificates were issued March 20, 1869, it attached and vested the stock in the Lehigh valley company as a pledge, but sixteen months subsequently, when he assigned it to Mrs. Welles, he assigned it subject to his contract with the Lehigh company.

It is clearly within the definition of a pledge. "The term 'collateral security' has in recent years come into general use, to

designate a pledge of negotiable paper, corporate stocks, or other incorporeal personalty as distinguished from a pledge of corporeal chattels." Jones, Pledges, 2.

There is nothing in the evidence to show any conversion by the Lehigh valley company of this stock. It was issued in their name with the knowledge and consent of Welles. He still was the owner, and as such had notice that he was entitled to his *pro rata* share of the preferred stock. But this he refused,—the pledge still remained and the plaintiffs' right is only to redeem. If they are unwilling to pay the amount advanced by the pledgees, then a decree may be made, directing a sale of the stock, and after a payment of the amount due the Lehigh valley company, the balance to be paid to the plaintiffs. This view of the case negatives the idea that the agreement of September 12 was a postponement of the time of payment, and also that the Lehigh valley company elected to keep the stock and pay its face value with interest. If it is claimed that the master found the fact of election, it is enough to say, it is but an inference from undisputed facts, and the court can correct the finding, if erroneous (Cake's Appeal, 16 W. N. C. 489); and it is now found that the Lehigh valley company held the stock as a pledge, and are liable as pledgees, and not otherwise.

The master was right in holding that there was no liability on the part of the company for the preferred stock.

This view of the case disposes of the material questions raised by the exceptions to the master's report, and all the exceptions that are not sustained by this opinion are dismissed.

This, being held to be a bill to redeem, and the account being taken for the benefit of both parties, they should pay the costs equally.

The court thereupon stated an account and made a decree in accordance with the foregoing opinion; whereupon the plaintiffs appealed.

*Rodney A. Mercur, William Foyle, Edward Overton, Jr.,* and *John F. Sanderson,* for appellants.

*Samuel Dickson, E. G. Platt* and *John C. Bullitt* for appellees.

Opinion by Mr. Justice Paxson:

This case has been twice argued, the second time upon our motion, and has been carefully considered. The amount in controversy is large and the testimony voluminous. It occupies over 2,000 printed pages.

There are sixty-nine assignments of error. The greater portions of them are to questions of fact. The court below sustained the master, substantially, in his findings of the facts, but differed from him in some of his conclusions therefrom. With such a mass of testimony as we have in this case, it is not to be expected that we shall reverse the master upon the facts, concurred in as they are by the court below, unless clear error has been pointed out. This has not been done, and we cannot do otherwise than give the findings of fact the same weight and conclusiveness as if they had been found by a jury. The value, wisdom, and necessity of this rule becomes daily more apparent in consequence of the growing partiality of the profession for equity practice. The enforcement of this rule disposes of all the questions of fact in the case.

The facts as established present two leading questions,—viz.: (a) the liability of Welles for the payment of damages for the right of way where the railroad diverges from the canal; and (b) whether the $250,000 of capital stock was pledged to the Lehigh Valley Railroad Company under the agreement of September 12, 1866. The other questions in the case are, in the main, subdivisions of these two, which are the pivotal ones upon which it must be decided. It would consume much time and serve no good purpose for me to enter upon their discussion. If discussed at all they must be discussed separately. The opinion of the learned and able judge of the court below renders this unnecessary. His views upon both questions are well considered and are entirely satisfactory. His opinion sufficiently vindicates his decree. Nor have we any doubt that his decree fully meets the justice of the case. I am not aware of anything to show that Colonel Welles, during his lifetime, ever made any demand or claim upon the Lehigh Valley Railroad Company for this large amount of money. It seems almost incredible that he should not have done so had he believed that the company was his debtor. It was a solvent corporation, fully able to respond to any such demand, and this was well known to Colonel Welles. That he did not make such claim was probably

owing to the fact that he owed the company a large amount of money which he would have to pay before he could lift the stock which the company held in pledge, and that the stock was of little or no value. It was, perhaps, his misfortune that the stock was worthless, if the fact be so, yet it was what he bargained for, and those who have acquired his interests have no just cause to complain that they do not get something else. Had Colonel Welles lived, I do not believe that this bill or any other bill of a similar nature would have been filed. It is perhaps natural that the appellants who bought this claim of his administrator at an orphans' court sale, and knowing less about the facts, should file a bill and press it to a final decree.

It was urged, however, that even if the rulings of the learned judge below upon the law are correct, he has fallen into error in his decree. The matter complained of is the 215 shares of the North Branch Canal stock which Colonel Welles failed to deliver. Both the master and the court below charged him with this stock at par, amounting to $21,500. Upon the reargument the attention of counsel was particularly called to this matter, and it was alleged by appellants' counsel: (a) That this sum of $21,500 should not be deducted from the amount due Welles under the contract with Packer; (b) that in the alternative decree it is twice deducted; and (c) that if the 215 shares are to be deducted at all, it should only be deducted at their actual value.

I am unable to find, after a somewhat laborious examination of the figures, that these shares are twice deducted in the alternative decree. Nor does it matter if they are, as no question touching the alternative decree is now before the court, and a mistake therein is harmless. The claim that these shares should not be deducted at all is not well founded. It was a part of the contract entered into by Colonel Welles that he was to deliver these shares; a portion of the consideration for which he was to receive $1,050,000. Having failed to deliver them they must necessarily be charged to his account. The only remaining question is, At what price? Prima facie they must be charged at par, $100 per share. The appellants contend, however, as before stated, that if charged at all, it should only be at their market value. The burden of proof upon this point is upon the appellants. It is alleged in a note to their paper book upon the reargument that the market value of this stock was only $30 per share. No evi-

dence has been pointed out to us bearing upon this point, and it is too much to ask us to go through 2,000 pages of testimony to search for what may not be found. I do not understand the master or the court below to say anything about it. Desiring, however, that no injustice may be done, if before this record goes down, the learned counsel will call my attention to any facts which would justify us so to do. I will gladly, with the assent of my colleagues, amend the decree to conform to such facts.

The decree is affirmed and the appeal dismissed, at the costs of the appellants.

Thereafter, on February 6, 1888, the decree herein was modified by the following opinion of the court, delivered by MR. JUSTICE PAXSON:

In the decree of the court below, the appellants are charged with the 215 shares of North Branch Canal stock at par, *viz.*, $100—$21,500. This stock Colonel Welles failed to deliver under his contract, and for his failure to do so the appellees were entitled to damages. We do not think, however, the appellants should be charged with it at its par value. It is proper to say also that I can find no evidence of its having been twice charged as contended by appellants.

We have but little evidence of the value of this stock. It was conceded by appellants, however, that it was worth $30 per share, and in the amendment of the decree, which is now made, it is placed at that figure, with the proper allowance of interest.

The practical effect is to reduce the amount which the appellants must pay to redeem, to $43,329.73; and with this modification of our order of January 3, 1888, the decree is affirmed and it is ordered that the record be remitted.